| | | |
|---|---|---|
| **KURT KALTREIDER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 3:12-cv-450** |
| | ) | **Judge Aleta A. Trauger** |
| **v.** | ) | **Magistrate Judge Griffin** |
| | ) | |
| **S. GUERRY SIMMONS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

On February 12, 2015, following a jury trial, the jury entered a verdict for plaintiff Kurt

Kaltreider, finding that he was entitled to payment of $230,666.54 from defendant S. Guerry

Simmons for breach of contract. (Docket No. 189.) The defendant has filed a Motion for

Judgment as a Matter of Law under Rule 50(b) (Docket No. 198) and a Motion for New Trial

(Docket No. 200), to which the plaintiff filed a combined Response in opposition (Docket No.

210), and the defendant filed a combined Reply (Docket No. 214). For the reasons stated herein,

both motions will be denied, although the court will reduce the jury's award by $2,235 to

account for one disallowed expense item.

## BACKGROUND

This case concerns an alleged oral contract between the *pro se* plaintiff, Kurt Kaltreider,

and the defendant, S. Guerry Simmons. In his Amended Complaint, Kaltreider alleged that he

and Simmons entered into an agreement in 1994 for the exploitation of formulas developed by

Kaltreider for picking publicly traded stocks, that Simmons breached the agreement, and that

Simmons owed Kaltreider money as a consequence. Kaltreider claimed damages from March

2008 forward, at which point Simmons ceased paying Kaltreider under the alleged contract.

The case was tried to a jury in February 2015. Five witnesses testified at the trial, including Kaltreider, Simmons, Cindy Johnson, Chuck Webb, and Weaver Barksdale.[1] The jury rendered a verdict for Kaltreider and awarded him $230,666.54. (Docket No. 188 (sealed).)

The defendant has filed two post-trial motions, which collectively ask the court to reverse the jury's verdict or, in the alternative, to vacate the verdict and order a new trial. In support of both motions, the defendant argues that the evidence does not justify a verdict for Kaltreider. In support of the Motion for New Trial, the defendant additionally argues that the court should declare a mistrial because the trial court treated the defendant unfairly, abandoned its neutral judicial role by advocating for the plaintiff, refused to issue a crucial jury instruction, and made erroneous evidentiary rulings.

## LEGAL STANDARDS FOR RULE 50(B) AND RULE 59(A) MOTIONS

Under Rule 50(b), the court may grant judgment notwithstanding the jury's verdict if, "viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Gray v. Toshiba Am. Consumer Prods, Inc.*, 263 F.3d 595, 598 (6th Cir. 2001). In ruling on the motion, the district court may not reweigh the evidence or assess the credibility of witnesses. *Id.* at 600. Under Fed. R. Civ. P. 50(a), a motion for judgment as a matter of law must "specify the judgment sought and the law and facts on which the moving party is entitled to the judgment." *See Kusens v. Pascal Co., Inc.*, 448 F.3d 349, 361 (6th Cir. 2006). A post-trial motion for judgment under Rule 50(b) may not advance additional grounds

---

[1] Kaltreider called Simmons in Kaltreider's case-in-chief. Simmons also testified as part of his own case-in-chief. Kaltreider testified in his own case-in-chief and on rebuttal. Simmons' counsel cross-examined Kaltreider on rebuttal.

that were not raised in the pre-verdict motion under Rule 50(a).  *Id.*  However, in stating the grounds in the required pre-verdict motion, technical precision is not necessary.  *Id.*  "Accordingly, where Rule 50(a)'s purpose—*i.e.*, providing notice to the court and opposing counsel of any deficiencies in the opposing party's case prior to sending it to the jury—has been met, courts usually take a liberal view of what constitutes a pre-verdict motion sufficient to support a post-verdict motion.  *Id.*

Under Rule 59(a)(1), the court "may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law or in federal court."  The Sixth Circuit has determined that new trials under this rule should be granted only when a jury has reached a seriously erroneous result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.*, the proceedings being influenced by prejudice or bias.  *Mitchell v. Boeicke*, 440 F.3d 300, 303 (6th Cir. 2006) (internal quotation marks omitted).  The burden of demonstrating the necessity of a new trial is on the moving party, and the ultimate decision whether to grant such relief is a matter vested within the sound discretion of the district court.  When a party requests a new trial on the ground that the verdict is against the weight of the evidence, the verdict must be upheld "if it is one the jury reasonably could have reached; [the court] cannot set it aside simply because [the court] think[s] another result more justified."  *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1066 (6th Cir. 2015) (internal quotation omitted).[2]

---

[2] Also, "[a]n erroneous evidentiary ruling amounts to reversible error, justifying a new trial, only if it was not harmless; that is, only if it affected the outcome of the trial."  *Decker v. GE Healthcare Inc.*, 770 F.3d 378, 391 (6th Cir. 2014).  Similarly, a district court's refusal to give a jury instruction constitutes reversible error only if (1) the omitted instruction is a correct

<u>ANALYSIS</u>

## I. **Rule 50(b) Arguments**

In his Rule 50(b) motion, Simmons argues that judgment should enter in his favor because (1) the evidence established lack of mutual assent or established that the contract terms were indefinite and therefore unenforceable,[3] (2) the contract terms are contrary to public policy, (3) Kaltreider did not present proof adequate to sustain the jury's award, which therefore must be have been the result of prejudice, passion, or sympathy for Kaltreider, (4) Kaltreider has unclean hands, and (5) the Statute of Frauds prevents the contract from being enforced.

### A. **Weight of the Evidence**

Kaltreider testified that he and Simmons entered into an oral agreement in the summer of 1994, while Simmons was visiting Kaltreider's residence in Tellico Plains, Tennessee.[4] In his version of events, Simmons made an offer to Kaltreider to exploit the formulas and split the profits "50/50," but Kaltreider rejected the offer in favor of a deal more favorable to *Simmons*. (Docket No. 193, February 11, 2015 Trial Transcript (Day 2) (hereinafter, "Tr. II"), at 188:17-189:2.)  According to Kaltreider, the parties orally agreed to the following terms: (1) Simmons

---

statement of the law, (2) the instruction is not substantially covered by other delivered charges, and (3) the failure to give the instruction impairs the requesting party's theory of the case. *Taylor v. TECO Barge Line, Inc.*, 517 F.3d 372, 387 (6th Cir. 2008).

[3] Simmons also argues that Kaltreider failed to meet his burden of proof to show that a contract existed.  That argument is largely redundant of the specific arguments relating to liability and damages.

[4] (*See* February 10, 2015 Trial Transcript (Day 1) (hereinafter "Tr. I"), at 33:18-21; Tr. 34:7-38:13 (discussing specific terms that "we talked about on my front porch"); 43:8-9 ("We agreed upon that.  We shook hands as honorable men."); 44:16-17 ("I made the contract, we shook hands, we agreed to it."); 124:11-16 ("Mr. Simmons came over to my house outside Tellico Plains in the woods in late summer, early fall of 1994[.]").)

exclusively would utilize Kaltreider's formulas for picking stocks and would not disclose them to anyone else; (2) Simmons would utilize Kaltreider as a reference for the formulas, (3) Simmons would have unfettered access to Kaltreider's records concerning the formulas, (4) Simmons would run the day-to-day business (soliciting clients, setting up the necessary computer systems, etc.), (5) Kaltreider would retain business from one particular pre-existing client, (6) Simmons would receive 90% (and Kaltreider 10%) of the first $50,000 of gross income from exploitation of the formulas, (7) Simmons would receive 75% (and Kaltreider 25%) of all gross income thereafter, (8) the 90/10 and 75/25 splits would apply to money generated by either party for asset management or sales of research related to the formulas, and (9) Simmons could improve the formulas and implement the improved formulas, provided that Simmons conducted five years of "back testing" and either consulted with Kaltreider before doing so or consulted with Kaltreider if any problems arose in applying the formulas. (*See* Tr. I at 34:1-39:8; 40:11-41:22; 43:1-9; Tr. II at 188:17-189:7.) Kaltreider also testified that Simmons was obligated to keep Kaltreider up to date concerning the state of the formulas and any adjustments that Simmons had made to them. (Tr. I at 40:11-41:21; 43:1-4.) Through March 2008, Simmons paid Kaltreider in installments that collectively totaled $662,000.[5]

In his testimony, Simmons acknowledged that he met with Kaltreider in Tellico Plains in 1994, that they shook hands, and that they entered into some type of agreement. (Tr. II at 109:5-110:15.) However, Simmons testified that he rejected an offer to partner with Kaltreider and that

---

[5] (*See* Tr. I. at 44:16-19 ("I was paid $662,000 over about 10 years.") and 129:7-9 ("Q: Mr. Simmons has paid you over $650,000, correct? A: 662,000."); Tr. II at 193:23-194:1 ("Mr. Simmons paid me our agreed-upon percentage. I, as a partner, supplied the knowledge and the ability for us to have a company. He supplied the salesmanship and computer skills."); *see also* Plaintiffs Exhibit ("Pltf. Ex.") 15 (W-2 Forms from Simmons' employer, 2003 to Q1 2008).)

Simmons only agreed to retain Kaltreider as an occasional consultant and to have access to Kaltreider's work in the future, for which Simmons would pay Kaltreider an agreed-upon percentage based on Simmons' exploitation of the formulas.[6]  Kaltreider denied that Simmons had hired him only as a consultant.  (Tr. I at 127:3 ("I was not a consultant."); 109:8 ("He never asked me to be a consultant.").)

"An oral agreement is enforceable, but the party seeking to enforce it must prove (1) mutual assent to the contract's terms and (2) that the terms are sufficiently definite to be enforceable."  *Davidson v. Holtzman*, 47 S.W.3d 445, 453 (Tenn. Ct. App. 2001).  "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy."  *Davidson*, 47 S.W. 3d at 453 (quoting *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990)).  "The

---

[6] (Tr. II at 54:6-15 ("I remember what the deal was, and it's nothing like what you're – in the pleading."); 56:6-12 ("We did make an agreement.  I agreed to pay you a part of the income that I hoped to gain from using the work that you gave me free and clear in 1992.  And that the only reason that I wanted to make an agreement with you at that time was in order to retain your services a[s] a consultant in case the thing broke."); 57:8-15 ("And I wanted access to any future part of it that I could get, in case the car broke down or I needed a new car.  So I agreed to pay him part of my income going forward in order to have access to his future work . . . ."); 64:17-24 ("You said, why don't you just take all of my stuff and do with it what you can.  It was actually at that point – that would have been in July that I began the conversation that concluded on his porch . . . . I said, well, . . . [w]hy don't you work for me as a consultant going forward because I may run into trouble with this product . . . ."); 69:2-8 ("You wrote down what you thought would be an appropriate arrangement.  You asked me to sign it.  I refused.  I said, Kurt, I'm not signing anything.  This is the deal.  I will hire you as a consultant.  Take it or leave it.  I had the formulas.  I had clients.  I didn't need you as a consultant.  I wanted you as a consultant."); 110:4-15 ("So I said, I would like to hire you as – keep you on as a – and he needed the money.  So I'd like to keep you – bring you on as a consultant in case something goes wrong, the markets change, and you create new formulas or you want to improve on this formula, I would like to have access to them.  That was the deal.  And the deal was I would pay him 10 percent of the first 50,000, 25 percent of the next 50,000 and 20 percent over that, which would amount to about 20 percent of everything, so as I was using his formulas.").)

fact that one or more terms of a proposed bargain are left open or uncertain *may* show that a manifestation of intention is not intended to be understood as an offer or as an acceptance." *Id.* (emphasis added). Simmons argues that neither requirement for an oral contract has been met, essentially repeating arguments that he made to the jury and that the jury rejected.

First, Simmons argues that that there was no mutual assent because he testified that he did not enter into an oral agreement with Kaltreider, who offered only "self-serving" testimony to the contrary. This is a meritless argument, because the difference in testimony created a genuine dispute of material fact for the jury to resolve, and Simmons' testimony was just as "self-serving" as Kaltreider's. The jury was free to disbelieve Simmons and to credit Kaltreider's recollection of events, which the jury evidently did. *See Davidson*, 47 S.W.3d at 454 (upholding jury verdict in dispute concerning oral contracts, on the basis that, "[b]ecause the parties' testimony was sharply conflicting, the jury was required to assess the credibility of the witnesses. It is apparent from the verdict that the jury was not impressed with [the defendant's] version of the parties' dealings or his explanation that his responses to [the plaintiff's] correspondence were in regard to compensation owed for consultation.") Indeed, both Simmons and Kaltreider acknowledged having a discussion in 1994 at Kaltreider's residence – they just gave differing versions of the substance of that discussion. Even though several trial witnesses were unable to corroborate Kaltreider's version of events, none of those witnesses was present at the 1994 meeting between Kaltreider and Simmons. The jury was free to take that consideration into account in assessing the veracity and accuracy of Kaltreider's recollection of the 1994 meeting. Furthermore, given that Simmons in fact paid Kaltreider $662,000 through 2008, the jury could have treated Simmons' periodic payments as part performance of an oral agreement, lending credence to Kaltreider's testimony that the parties had entered into an oral agreement and

that Simmons in fact paid Kaltreider under that agreement through March 2008.  *See Gurley v. King*, 183 S.W.3d 30, 41 (Tenn. Ct. App. 2005) ("Part performance under an agreement may remove uncertainty and establish that a contract enforceable as a bargain has been formed.") (quoting Restatement (Second) of Contracts § 34(2) (1979)).  Simmons also contends that the record does not reflect offer and acceptance, but Kaltreider testified that the parties negotiated on his porch, that Simmons actually made an offer to Kaltreider of a "50/50 split," that Kaltreider rejected that offer in favor of a split more favorable to Simmons, that the parties discussed the terms noted in the previous paragraph, and that Simmons accepted Kaltreider's offer on those terms.[7]

Second, Simmons argues that the terms of the alleged contract were too indefinite to be enforceable because Kaltreider was unable to state with clarity whether the contract was for a definite term or what actions would constitute a breach of the agreement.  *See Peoples Bank of Elk Valley v. ConAgra Poultry*, 832 S.W.2d 550, 553-54 (Tenn. Ct. App. 1991) ("If the essential terms of an alleged agreement are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract.")  As to duration, Kaltreider testified that, as he understood the agreement, Simmons agreed to utilize the formulas for the rest of his (Simmons') career (Tr. I at 146:12-147:15), although Kaltreider stated that there may have been legal grounds on which Simmons could have terminated the contract (*id.* at 147:22-148:3.)  In

---

[7] Moreover, the court (1) specifically instructed the jury that Simmons' position was that he had *not* entered into an oral contract with Kaltreider, (2) instructed the jury about the general standards for formation of a contract, including the obligations of "mutual assent," offer, acceptance, and consideration, and (3) instructed the jury about the standards specific to oral contracts, including the requirement that there be a "meeting of the minds" on terms that are "sufficiently definite" to be enforceable and that were "clear enough" for the parties to understand their mutual obligations.  (Tr. II at 236:22-239:7.)

her opening statement and in closing argument, Simmons' counsel maintained that it was incredible to believe that Simmons had bound himself to use Kaltreider's formulas indefinitely. In her opening statement, Simmons' counsel stated that the type of agreement alleged by Kaltreider was "not the American way" because "[o]ur country is based upon freedom." (*Id.* at 15:23-16:3.)  In closing, Simmons' counsel argued that "simple rationality contradicts what Mr. Kaltreider says, because no one in their right mind would make a contract like that, where they have to pay someone for the rest of their lives to do a certain thing." (Tr. II at 221:7-11.)  The jury may have rejected this argument by finding that, contrary to Simmons' testimony, he did agree to utilize Kaltreider's formulas or their derivatives indefinitely – *i.e.*, that someone "in his right mind" did agree to that term.

Regardless, Simmons' argument concerning contract duration may have been a red herring, because the jury reasonably could have concluded that Simmons had not ceased exploiting Simmons' formulas in the first place.  Kaltreider's Exhibit 14 contains a January 2010 marketing printout that touts Simmons' use of mathematical value formulas to choose stocks, which Kaltreider claimed were either his (Kaltreider's) formulas or derivatives thereof. Kaltreider also testified that Simmons continued to profit from Kaltreider's formulas after March 2008.[8]  By contrast, according to Simmons, Simmons created his own mathematical value

---

[8] (*See* Tr. I at 44:3-7 ("[H]e's using my formulas.  I even have it as long ago as – this started in around 2012 or something.  I even have them in 2011 with him saying that he's got – he's using my formulas."); 133:10-11 ("There are no new formulas, and his very own brochure from 2010 says that."), 135:10-15 ("Q: Are you alleging that he changed the formulas or not?  A: No.  I think what he did was add trading techniques, technical analysis and economic factors.  That's what he did.  He did not create any new formulas.  He uses my one formula[.]"), and 136:5-11 ("A: I do know what Mr. Simmons is doing. . . .  Q: [W]hat is it based on?  . . . A: His own brochure.").)

formulas to choose stocks, independent of the formulas created by Kaltreider.  (Tr. II at 44:13-14

("When I terminated [Kaltreider], I terminated him because I had created new formulas that were

completely different than his.")  Simmons acknowledged that he had removed Kaltreider's name

from the brochure, which nevertheless "continue[d] to say that the portfolio management

strategy that I was now implementing was originally founded on mathematical value theory,

*which I got from you* [*i.e.*, Kaltreider], which is also in the public domain."  (Tr. II at 40:17-21

(emphasis added).)  Based on the evidence in the record, the jury could have disbelieved

Simmons' explanation as to why he removed Kaltreider's name from the brochure, found that

Simmons in fact continued to profit from Kaltreider's formulas (or at least a derivative of

Kaltreider's formulas) after 2008, and found that Simmons failed to pay Kaltreider under their

oral agreement to pay him for continuing exploitation of those formulas.  In other words, the jury

may have found that Simmons stopped paying Kaltreider while retaining the benefit of their

bargain, namely Simmons' exclusive right to profit from Kaltreider's formulas.  For purposes of

this dispute, the jury reasonably could have believed that a durational term was not essential

because Simmons had never abandoned utilizing Kaltreider's formulas in the first place.  Indeed,

the jury might have concluded that the contract persisted only until Simmons ceased exploiting

the formulas, a condition that had not yet occurred.

On a related point, Simmons also argues that there was insufficient evidence to show

breach.  This argument is not well-founded.  There was ample evidence of potential breaches in

the record.  Kaltreider testified that Simmons was obligated to provide Kaltreider the opportunity

to conduct back-testing before modifying the formulas but that Simmons broke that promise.

(Tr. I at 37:20-38:13; 134:24-135:8 ("I've never seen one bit of back testing . . . .").)  Kaltreider

testified that Simmons was obligated to keep Kaltreider apprised of how the formulas were being

used but that Simmons kept Kaltreider in the dark for several years, while continuing to exploit (or tinker with) the formulas. (*Id.* at 32:4-16; 38:22-39:5; 39:20-23; 40:25-41:21.) Kaltreider also testified that Simmons agreed to utilize Kaltreider's formulas for as long as he (Simmons) stayed in his current career and to pay Kaltreider a portion of revenue generated from the agreement but that Simmons breached the agreement, either by (a) altering the formulas or misusing the formulas, (b) abandoning the formulas without giving Kaltreider the opportunity to modify them to make them work, or (c) (as explained in the previous paragraph) continuing to utilize the formulas without paying Kaltreider for revenue generated. Although Simmons is correct that Kaltreider offered differing accounts of the potential breaches that occurred, Kaltreider did (collectively) testify to multiple potential forms of breach, and it was for the jury to determine whether any inconsistencies in Kaltreider's testimony undermined his allegations of breach.

Simmons also contends that Kaltreider failed to present competent proof of his damages. Kaltreider provided a damages estimate to the jury of $230,666.54. To arrive at that estimate, he (1) identified the final payment that he received in 2008 ($10,930) and multiplied it by 19 (*i.e.*, nineteen quarters) to reflect "the amount of quarters that [Simmons] missed," (2) added 3.5% annual interest, and (3) added $2,235 in travel expenses. (Tr. I at 47:2-49:23.) In support of his post-trial motions, Simmons contends that it was arbitrary for Kaltreider to calculate his damages in this fashion and that the estimate was not based on proof of what Simmons actually earned from exploiting the formulas. Notably, Simmons' counsel did not cross-examine Kaltreider concerning the basis for his damages estimate, Simmons offered no contrary damages estimate (other than zero), and Simmons' counsel did not address this topic in closing. Under the circumstances, the jury was entitled to rely on Kaltreider's damages extrapolation in reaching its

damages verdict.  Whether the calculation was an accurate representation of what Kaltreider was

owed, a best estimate, or wild speculation was a matter for the jury to weigh in its deliberations.

The jury awarded Kaltreider exactly the amount that he requested in his evidence,

indicating that the jury's damages award was based on evidence rather than sympathy, passion,

or prejudice.  Indeed, the court specifically instructed the jury that damages are prohibited only

when the existence of damages is uncertain, not when the amount is uncertain, that mathematical

certainty was not required, and that damages may be reasonably inferred from the evidence.  (Tr.

II at 242:13-25.)  The jury instructions also stated that the fact that the court had instructed the

jury concerning the proper measure of damages should not be considered as reflecting any

indication by the court as to which party was entitled to a verdict.  (*Id.* at 243:10-19.)  The court

also instructed the jury as follows:

> Sympathy or hostility must not enter into your deliberations as jurors, no matter
> what your sympathy or hostility may lead you to think.  Sympathy or hostility has
> no place in the trial of a lawsuit, or in the making up of your minds as to what
> your verdict shall be.  Do not permit any such emotional considerations to enter
> into your deliberation at all.

(*Id.* at 32.)  The jury presumptively understood and applied these instructions in its deliberations.

*Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 794 (6th Cir. 2002).

With respect to damages, Simmons does make one valid point: the court should have

instructed the jury that damages relating to travel expenses were not recoverable under the

contract.  The court will therefore reduce the verdict by $2,235 to account for the amount

claimed by Kaltreider for travel expenses.

### B.  Additional Arguments

#### 1.  Lack of Durational Limit

Simmons argues that the oral contract with Kaltreider is against public policy because it did not contain a durational term. In his oral Rule 50(a) motion, Simmons did not raise this argument (*see* Tr. II at 203:23-205:15), and it does not appear that he raised this argument at any point before trial (in his Amended Answer, in his Rule 56 motion, or otherwise). The argument is therefore waived and the court need not reach its merits.

Even if it were appropriate to reach the merits of this argument, it is not against public policy for someone to enter into a perpetual contract or a contract of an indefinite duration. *Parks v. Morris*, 914 S.W.2d 545, 549 (Tenn. Ct. App. 1995) (citing *Apco Amusement Co, Inc. v. Wilkins Family Restaurants of Am., Inc.*, 673 S.W.2d 523, 528 (Tenn. Ct. App. 1984)). Although indefinite contracts are not favored, a party can enter into one and a court can enforce it, if that is the parties' intent. *See Sun-Drop Bottling Co., Inc. v. Helton*, 2006 WL 547994 (Tenn. Ct. App. Mar. 6, 2006). Here, the jury could have found that the parties intended to enter into a perpetual contract, whereby Simmons either bound himself to utilize the formulas for the rest of his career without qualification or, in the alternative, for the rest of his career only insofar as he gave Kaltreider the chance to update the formulas to changing market conditions.

Even if the parties did not enter into a perpetual contract, when the duration of a contract is indefinite, it is to be performed within a reasonable time. *Parks*, 914 S.W. 2d at 549 (citing *Big Coca Cola Corp. v. World Bottling Co.*, 134 F.2d 718, 721 (6th Cir. 1932)). The jury could have found that Simmons bound himself to pay Kaltreider for as long as Simmons utilized Kaltreider's formulas or their derivatives, and that a "reasonable time" stretched as far as that condition was met.

2.  Unclean Hands

Simmons also argues that Kaltreider had "unclean hands" because Kaltreider disclosed his own formulas to Dr. Martin Moore. Simmons did not raise the defense of unclean hands in his Amended Answer (Docket No. 20), in support of his Rule 56 motion, in his pretrial "Succinct Statement of the Case" (Docket No. 136), in his proposed jury instructions (Docket No. 137), or in his Rule 50(a) motion before the jury began its deliberations. Simmons therefore waived the right to assert this defense at trial and, by the same token, waived the right to assert it in a post-trial Rule 50(b) motion.

3. <u>Statute of Frauds</u>

Simmons argues that the Statute of Frauds prevents enforcement of the contract. As the court instructed the jury, the equitable doctrine of partial performance provides an exception to the Statute of Frauds and permits an oral contract to be enforced, if there has been partial performance of the contract by one of the parties and reliance by the other party upon that performance. To show that this doctrine applies, the plaintiff must show, by a preponderance of the evidence, that (1) the defendant partially performed the alleged oral contract, and (2) the plaintiff relied upon the defendant's performance such that he would suffer an unjust or unconscionable injury and loss if the Statute of Frauds were applied and the contract was not enforced. (Tr. II at 239:8-241:5 (jury instructions concerning the Statute of Frauds and the partial performance exception thereto).)

Simmons claims that the record cannot support the reliance element because, according to Simmons, Kaltreider testified that the payments made by Simmons "were not even pursuant to the alleged oral contract." (Docket No. 199 at p. 18.) Simmons provides no citation to the trial transcript for this proposition. To the contrary, the basis for the payments from Simmons (totaling $662,000) was a focal point of dispute between Kaltreider and Simmons at trial, and

14

Kaltreider testified that Simmons cut checks to him under the agreement, rather than as a "consultant" (as Simmons claimed).[9]  The jury reasonably could have found that, in light of his ongoing business arrangement with Simmons, Kaltreider refrained from marketing his formulas to other investment managers or from updating the formulas while Simmons performed his end of the bargain and paid Kaltreider.  Thus, assuming that the jury found that the agreement could not be performed within one year, the evidence supported the application of the part performance exception to the Statute of Frauds.

### C.  Conclusion

For these reasons, the court finds there were genuine disputes of material fact and that the evidence supported the jury's verdict.  The court will therefore deny the Rule 50(b) motion.

## II.  **Motion for New Trial**

### A.   **Weight of the Evidence**

To the extent that Simmons' Rule 59 motion incorporates the arguments set forth in his Rule 50(b) motion, the court finds no basis for a new trial for substantially the same reasons set forth with respect to the his Rule 50(b) motion.  Specifically, the court finds that the verdict was not against the great weight of the evidence and, subject to one adjustment, that the damages were not excessive.  The court will address the defendant's asserted grounds for a mistrial separately.

### B.  **Alleged Misconduct by the Presiding Judge**

---

[9] (*See, e.g.*, Tr. I at 114:18-20 ("Q: But he [Simmons] certainly cut checks to you in the past; correct?  A: *According to our agreement*, he did.") (emphasis added)); 109:8 ("A: He [Simmons] never asked me to be a consultant."); Tr. II at 193:23-194:1 ("Mr. Simmons paid me our agreed-upon percentage.  I, as a partner, supplied the knowledge and the ability for us to have a company.  He supplied salesmanship and computer skills.").)

The defendant's Motion for New Trial asserts that the court delivered a verdict to Kaltreider by treating Simmons unfairly, by admonishing defense counsel in front of the jury, and by abandoning its neutral role and acting as an "advocate" for Kaltreider at trial. These are serious charges, which impugn the integrity and impartiality of the presiding judge.

To manufacture the appearance of bias by this court, Simmons cherry picks adverse rulings and statements by the court, divorces quotations from their context, omits reference to any rulings favorable to the defendant, omits reference to the court's castigation of the plaintiff at numerous junctures, and fails to acknowledge defense counsel's own failures during the course of trial.

The court has a responsibility to streamline the presentation of relevant evidence to the jury. Simmons attempts to spin the court's execution of this fundamental responsibility as "advocacy." As is often the case with a *pro se* plaintiff, Mr. Kaltreider was not skilled in the rules of evidence and trial procedure. As a consequence, during the trial, the court often had to intervene (either in response to an objection or acting *sua sponte*) to keep Kaltreider focused on relevant issues, to confine his testimony or questioning appropriately (such as limiting his cross-examination to the scope of direct or confining his rebuttal testimony to addressing points raised by Simmons with which he disagreed), and to prevent him from testifying through questions.

Simmons contends that a "substantial" amount of Kaltreider's testimony was provided to the jury while Kaltreider was questioning witnesses, thereby forcing defense counsel to "continually object," which made counsel look "unfavorable and obstreperous to the jury." This argument does a disservice to the court's extensive efforts at trial. Simmons fails to acknowledge that the court consistently *stopped* Kaltreider from testifying while questioning witnesses, *sustained* appropriate objections from Simmons' counsel (when raised), specifically

16

*admonished* Kaltreider for this conduct multiple times in front of the jury (including admonishing Kaltreider that he was "not lecturing a class"), and often acted *sua sponte* to cut off Kaltreider from offering impermissible testimony.[10]  For example, in a four-page section of the transcript of Kaltreider's cross-examination of Mr. Simmons, the court *sua sponte* intervened six times to prevent Kaltreider from asking irrelevant questions, from testifying through his questions, and from exceeding the scope of cross-examination – all without the need for an objection by Simmons' counsel.  (*See* Tr. II at 171:1-174:25.)  Only a true partisan could have

---

[10] For examples of the court acting *sua sponte* and admonishing Kaltreider in front of the jury, *see* Tr. I at 172:8-13 ("You may not testify at this point, Mr. Kaltreider.  You're asking her questions."); 172:20-24 ("Mr. Kaltreider, you are asking questions, not lecturing to a class . . . Ask a question of the witness); 180:19 ("You don't answer her questions.  You ask her questions."); 180:3-4 ("Mr. Kaltreider, ask her a question.  Don't tell her."); 196:17-18 ("Let's not testify.  You're asking him questions."); Tr. II at 8:12-13 ("Let's not tell him what it is.  Ask him if he knows what it is."); 9:19-20 ("You can't testify.  He either does or does not remember."); 24:1-12 ("Mr. Kaltreider, you cannot testify.  He's already agreed with you –"); 39:11-12 ("Don't say what it is.  Ask him a question."); 67:23-67:2 ("And you may not testify about it.  And it doesn't matter why you left Eagle, so move on to something else . . . [A]nd you have said inappropriately that you were let go.  So we've got both pieces of evidence and the jury can decide whether it's important to know which of you [is] telling the truth."); 67:23-24 ("Mr. Kaltreider, you may not testify."); 161:5-7 ("He's answered that question.  He's answered that question.  He said it's not going to happen.  That's what he said his answer was."); 171:6-9 ("This is not proper cross-examination.  He didn't testify about this at all on his direct examination.  Cross-examination has to relate to what he was asked on direct."); 172:7-8 ("You've asked that question.  Move on to something else."); 173:8-10 ("It doesn't matter what people in here have seen.  He doesn't need to testify to that."); 174:23-25 ("This is not something he testified to on direct.  So it's improper cross-examination.")  For examples of the court sustaining valid objections by Simmons' counsel (often as Simmons' counsel rose from counsel's table before she even had to speak) and admonishing Kaltreider in front of the jury, *see* Tr. I at 185:14-20 (sustaining objection) and Tr. II at 10:10-12 (sustaining objection and reminding Kaltreider that "You cannot testify."); 51:9-16 (sustaining two successive objections and reiterating that Kaltreider cannot ask a witness to speculate); 59:17-18 ("Sustained.  Ask a question he knows the answer to."); 84:5-6 (sustaining objection and directing Kaltreider to "[s]top testifying.  Ask a question.")

sat through the trial and concluded that the court allowed Kaltreider to run roughshod over trial

procedures, "forced" Simmons' counsel to "continuously object," and otherwise attempted to

place Kaltreider in a more favorable light to the jury. Moreover, the court instructed the jury as

follows:

> The parties for both sides may have objected to some of the things that were said
> or done during the trial. Do not hold that against either side. The parties have a
> duty to object whenever they think that something is not permitted by the rules of
> evidence. Those rules are designed to make sure that both sides receive a fair
> trial. And do not interpret my rul[ings] on their objections as any indication of
> how I think the case should be decided. My rulings were based on the rules of
> evidence, not on how I feel about the case. Remember that your decision must be
> based only on the evidence that you saw and heard here in court.

(Tr. II at 233:7-20.) The jury presumptively followed this instruction in its deliberations.

In a similar vein, by taking certain transcript quotes out of context, Simmons attempts to

characterize the court's execution of its basic trial responsibilities as advocacy for Kaltreider.

For example, at one point in his direct testimony, Kaltreider indicated that he was about to testify

concerning the issue of breach. After he began to describe the law as to what a "breach of

contract" is, counsel for Simmons immediately objected, and the court intervened by directing

Kaltreider not to attempt to state the law of breach, but instead to "describe to us in your words

why you think he breached the contract." (Tr. I at 39:17-19.) Taken in context, the court's

statement was appropriate and not an act of "advocacy": the court *sustained* the objection and

directed Kaltreider to focus on *facts* relating to breach.

Simmons also complains that Kaltreider improperly elicited sympathy from the jury

when Kaltreider twice "began" to discuss his alleged illness and disability. In one instance, Mr.

Kaltreider stated that he had a "very terrible disease," at which point the court intervened *sua*

*sponte* and cut off the statement. (Tr. II at 139:16-21.) Two questions later, Kaltreider began to

18

ask the witness about "a Klein's disorder that I have had," at which point Simmons' counsel objected, the court sustained the objection, and the court stated specifically that Mr. Kaltreider's illness was "not at issue here" and that he should "move on to something that is important." (*Id.* at 140:6-15.) The court presumes that the jury understood the court's ruling that the matter – which Kaltreider only hinted at – was not relevant to Kaltreider's claim. Regardless, the court instructed the jury not to let "any bias, sympathy, or prejudice that you may feel toward one side or the other influence your decision in any way." The jury presumptively understood and followed that instruction in its deliberations. *Conwood*, 290 F.3d at 794.

Simmons argues that the jury may have been confused into believing that Kaltreider and Simmons had entered into a written contract because, at one point in his direct testimony, Kaltreider relied upon his notes (perhaps including the Complaint) in recounting to the jury what he believed the terms of the oral contract were. Simmons' argument is without merit. It ignores the entirety of the trial record, which made abundantly clear that the central issue was whether the parties entered into an *oral contract* in 1994. Both parties' opening statements and closing arguments focused on whether the parties entered into an oral contract, Kaltreider emphasized repeatedly in his testimony that he and Simmons agreed to a deal by "shaking hands" as "honorable men" or words to similar effect, defense counsel questioned Kaltreider extensively as to why Kaltreider did not reduce the agreement to writing, Simmons denied that he had orally agreed to a contract with Kaltreider, and the jury received instructions specific to whether the parties had agreed to an oral contract, including instructions regarding the Statute of Frauds. Moreover, in the cited passage, the court clarified with Kaltreider, in the jury's presence, that he was "giving what you think the terms of the agreement were," to which Kaltreider stated that

"[t]his is what we *talked about* on my front porch, yes, ma'am."  (Tr. I at 35:6-7 (emphasis added).)

Simmons also complains that the court "improperly instructed" Kaltreider how to present his case, thereby giving the jury the impression that the court was advocating for Kaltreider.  The examples cited by Simmons are relatively mundane directives from the court to Mr. Kaltreider during the course of trial proceedings, generally in instances in which Kaltreider began testifying about issues of limited relevance.  There is nothing inherently improper about the court's requiring the parties to focus on disputed issues, which streamlines the presentation of evidence to the jury, fosters judicial economy, and avoids wasting time and resources.  Simmons quotes three statements made by the court during the first day of proceedings (Tr. I at 25:2-8, 39:17-19, and 43:19).  Simmons omits, however, the context in which the court made these statements.  For example, during his direct testimony, Kaltreider began a sentence that would have addressed his reaction to the Magistrate Judge's August 13, 2013 summary judgment opinion in this case.  (*Id.* at 24:20-21).  Before Kaltreider finished the sentence, Simmons' counsel objected, the court intervened, and the court admonished Kaltreider that "it really do[es]n't matter what was said in summary judgment."  (*Id.* at 24:22-25.)  The court directed Kaltreider to focus on the nature of his alleged business relationship with Simmons and the terms of their alleged agreement.  The elivered charges, and (3) the failure to give the instruction impairs the requestin perverse logic, Simmons seems to argue that it was unfair for the court to focus the presentation of evidence on relevant issues.

Simmons also complains that the court "coached" Kaltreider by indicating to Kaltreider the nature of rebuttal testimony and rebuttal evidence.  In a single instance, the court asked Kaltreider whether, in light of the defense's cross-examination of him, there was anything else

that he wanted to address or explain.  (Tr. I at 159:24-160:2.)  The court's statement was an accurate recitation of the nature of redirect testimony.  At any rate, in redirect, Kaltreider briefly testified that he did not attempt to blackmail Simmons and complained that it was unfair for Simmons not to pay him.  (*Id.* at 160:4-161:13.)  Simmons does not explain why Kaltreider's testimony, which contained nothing revelatory, somehow prejudiced him.

Similarly, outside the presence of the jury, the court told Kaltreider that, after Simmons finished testifying, Kaltreider could take the stand again to counter anything that Simmons had said.  (Tr. II at 136:23-137:1.)  After Simmons finished testifying, the court told Kaltreider (in the jury's presence) that he had the option to testify, at which point Kaltreider asked whether the court would "please answer the following question for me."  (*Id.* at 184:23-185:14.)  Rather than permit Kaltreider to continue, the court intervened, directed Kaltreider that he could testify, directed him not to direct any questions to the court, and indicated that he could say "[a]nything that you want to say to counter [Simmons'] testimony.  If you think he lied about something, then you tell what your testimony is about that."  (*Id.* at 185:15-24.)  Simmons complains that the court gave the jury the impression that Simmons in fact lied and unfairly elicited testimony from Kaltreider (when Kaltreider might otherwise have neglected to offer more testimony).  The court's statement was an accurate statement of the nature of rebuttal evidence, and the court did not comment on the credibility of testimony by Simmons or Kaltreider.  Furthermore, Kaltreider in fact testified on rebuttal about disputed issues, and the court permitted Simmons' counsel to cross-examine Kaltreider on rebuttal.  Simmons appears to be complaining that he was prejudiced because the court applied basic trial procedures appropriately, namely by affording Kaltreider his right to present rebuttal evidence.

Simmons also complains that the court elicited critical testimony by asking a substantial number of questions during Kaltreider's case, thereby indicating "an alignment on the part of the Court" with Kaltreider. Simmons again cherry picks citations to the record to create an impression of partiality. The court asked questions of all witnesses in the case or otherwise intervened during questioning, such as cutting Kaltreider off before he gave more than a "yes" answer to a leading question (Tr. I at 119:11-14), directing a witness to provide a responsive answer (Tr. II at 123:18-124:14), obtaining necessary background information from a witness so that the jury would not be confused about the individual's relationship to the case (Tr. I at 193:17-194:16), and cutting off lines of questioning by Kaltreider that were going nowhere (Tr. II at 8:19-9:3.) None of these actions indicated or reflected favoritism towards one side or the other.

Simmons also complains that the court was unfair to him with respect to the marking and presentation of exhibits. For example, Simmons claims that the court favored Kaltreider by prompting him to enter several exhibits into evidence. Simmons neglects to mention that the court did the same for Simmons when, for instance, defense counsel forgot to enter Exhibit 10B into evidence at the conclusion of a line of questioning. (Tr. II at 138:18-19.) Similarly, when defense counsel had difficulty determining how best to number certain exhibits, the court provided suggestions to counsel to keep the record clear. (Tr. II at 125:19-126:6.) The court even denied Mr. Kaltreider's request to ask a question about that procedure. (*Id.* at 126:7-9.) Simmons also complains about the introduction of a brochure as rebuttal evidence during the testimony of Mr. Barksdale, in part because the exhibit was not on Kaltreider's case-in-chief exhibit list. As the court stated at trial, the exhibit *was* on Kaltreider's impeachment exhibit list, which is precisely the purpose for which the court admitted it on rebuttal.

Simmons also omits reference to the instances in which the court elicited testimony from witnesses that supported *Simmons'* case or that cut off lines of inquiry by Kaltreider.  For example, the court closed off lines of inquiry by Kaltreider (establishing that Ms. Johnson did not know anything about whether Mr. Kaltreider had requested that Simmons make some corrections to a certain dataset (Tr. I at 185:14-20)), got Kaltreider to admit on cross-examination that he had not given any money to Dr. Hartman (Tr. I at 84:8-9), asked a series of questions of Kaltreider (during his cross-examination by Ms. McKellar) designed to pin down whether Kaltreider had disclosed his formulas to Simmons before or after Kaltreider signed a 1992 agreement with Kaltreider's former business partner (Tr. I. at 101:8-102:7), interrupted non-responsive answers by Kaltreider to elicit responsive answers (*id.* at 116:24-117:11, 118:7-25), cut off Kaltreider before he could add detail after answering a question on cross (*id.* at 119:14), and established that Mr. Webb could not attest to the accuracy of a series of calculations that Kaltreider had prepared and was relying upon (*id.* at 202:17-203:2).  Indeed, in support of its Motion for Judgment as a Matter Law, Simmons relies upon *testimony elicited by questions from the court* – testimony that he claims supports a judgment in *his* favor.  (*See* Docket No. 199 at p. 6-7 (referencing Tr. II at p. 91:14-92:2), pp. 9-10 (referencing Tr. I at 134:1-135:8), and p. 10 (referencing 40:8-17)).

Simmons also complains that the court unfairly admonished his counsel for failing to have appropriate exhibit stickers, while at the same time "assisting" Kaltreider with his exhibits.  During a recess, the court attempted to sort out objections to Kaltreider's exhibits, which required the court to identify the exhibit numbers and the associated objections.  The court directed the parties to confer and to reconvene at 12:50 p.m.  (Tr. I at 52:3-19.)  Although Mr. Kaltreider appeared by that time, counsel for Simmons was 12 minutes late.  (Tr. I at 52:22-24.)

The court asked what had happened, counsel apologized (providing no explanation for violating the court's directive), and the court moved on to address the exhibit issue. (*Id.* at 52:22-53:1.) In the ensuing discussion, the court held that some exhibits could not come into evidence, indicated that some exhibits could come in through certain witnesses or with an appropriate foundation, and informed Mr. Kaltreider that he could question a witness about a particular topic without introducing tax returns. After the conference, counsel for Simmons cross-examined Kaltreider. During that examination, counsel for Simmons attempted to move in several exhibits that had been marked incorrectly or that had not been pre-marked, leading to distracting on-the-record colloquies concerning the appropriate labels and numbers. (*See* Tr. I at 122:5-122:24; 125:19-126:6.) For example, the court indicated that the names on a particular document did not match the names contained on the parties' exhibit list, at which point defense counsel admitted that she "obviously should have done my exhibit list differently," apologized to the court, and admitted that she "d[idn't] know why it's [the exhibit] described that way." (*Id.* at 122:10-20.) During the ensuing recess – *i.e.*, outside the presence of the jury – the court expressed frustration to both parties about the manner in which exhibits were being handled in front of the jury in violation of the court's procedures.[11] (*Id.* at 141:12-142:5.) Even if the court had not conveyed that requirement in advance, the court was critical of both parties, the court expressed its frustration

---

[11] Counsel for Simmons suggested on the record that it was unaware of the court's pre-marking requirement, a suggestion that it brazenly repeats in its post-trial motions. That requirement is set forth in Judge Trauger's publicly available Individual Practices and Procedures. (Prac. & Proc. Manual for Judges and Magistrate Judges for the Middle District of Tennessee, Judge Aleta A. Trauger, Rule V.K. ("Judge Trauger wants exhibits to be premarked.").) Approximately six months before the trial, the Magistrate Judge also issued a detailed Order to Mr. Kaltreider concerning the pre-marking of exhibits, which placed counsel for Simmons on further notice of this requirement. (Docket No. 165.)

outside the jury's presence, and the statement on the record (even if it were "unfair") did not explicitly or implicitly reflect bias for or against either party.

Simmons also complains that the court showed "impatience" with defense counsel, thereby giving the jury the impression that the court favored Kaltreider. The court once stated that Ms. McKellar should stand while objecting, stated that it was permissible for the plaintiff to ask Simmons leading questions, and once asked counsel to define a term that she was using when asking questions of Kaltreider. The court's straightforward handling of these situations was justified in each instance and, at any rate, amounted to three examples of court directives in the course of two full days of testimony.[12] Regardless, if impatience were somehow the measure of favoritism in this case, it was Kaltreider – not Simmons or his counsel – whom the court admonished most, often in the jury's presence.[13]

---

[12] Ms. McKellar claims that it was unfair for the court to remind her to stand while objecting, because she was "in the process" of standing while attempting to object in that particular instance. That is not what the court observed at the time. The court notes that Ms. McKellar similarly attempted to create a misleading record after trial, when she accused Mr. Kaltreider of addressing her co-counsel in a hostile and aggressive manner and accused the court of failing to prevent Mr. Kaltreider from doing so. (Docket No. 194, February 13, 2015 Trial Transcript, at 7:8-13.) As the court stated on the record, these were misrepresentations. (*Id.* at 7:20-23.)

[13] (*See, e.g.*, Tr. I at 172:20-21 ("Mr. Kaltreider, you are asking questions, not lecturing to a class.") and 192:16-19 ("Sustained. He doesn't – he doesn't even know what you are talking about. He doesn't know about Money Manager Review. He said that."); Tr. II at 12:18-19 ("Don't say anything, Mr. Kaltreider. Just show her the possible exhibits."); 12:24-25 ("Don't talk to counsel, you talk only to the court."); 39:11-12 ("Don't say what it is. Ask him a question."); 51:14-16 ("You may not ask him that question. You're asking him to speculate. He doesn't know what was in the mind of the bank."); 61:15-16 ("Sustained. The question doesn't make any sense."); 63:1-3 ("I don't know what the relevance of it is. Sustained. Move on to something else."); 66:17-19 ("And it doesn't matter why you left Eagle. Move on to something else."); 66:23-67:2 ("And you have inappropriately said that you were not let go. So we've got both pieces of evidence and the jury can decide whether it's important to know which of you is telling the truth."); 78:9-24 ("Mr. Kaltreider, . . . I'm not going to have the two of you arguing. . . . You have both tried to show the jury how smart you are . . . And we've had enough of it. You focus on whatever further questions you need to ask this witness. And no arguing.") (during a

Simmons also ignores his own violations of court procedures. For example, in addition to mishandling exhibits, asserting multiple baseless hearsay objections, and asserting a frivolous objection to the plaintiff's leading the defendant on cross-examination, counsel for Simmons inappropriately began to discuss the burden of proof in her opening statement (Tr. I at 16:19-20), improperly attempted to show the jury instructions (Tr. I at 211:12-17), inappropriately gave her opinion of the evidence (*id.* at 211:16-21 ("I don't know about you, but I found the evidence and his position . . .")), and was prepared to introduce the verdict form to the jury in violation of the court's procedures (*id.* at 221:20-22.)[14] These violations could have given Kaltreider a basis for complaint, had he been knowledgeable enough to assert it.

The court had no predisposition concerning the merits of this case and expressed none to the jury, directly or indirectly. As the trial transcript clearly shows, this was a challenging case that required intervention by the court as to both sides.

## C. Other Arguments

---

recess); 85:21-22 ("Ask another question. He doesn't know the motivation for a company."); 87:11-14 ("He has said he did not say that to you. So ask another question. He said, I did not ever propose 50/50."); 140:12-15 ("Mr. Kaltreider, your illness is not at issue here. He has admitted driving across the country with you at least twice. So move on to something that is important."); 141:10-12 ("The question he was asked is if you ever paid him anything. And the answer was no. So ask another question."); 146:9-10 ("I do not see the relevance of this line of questioning. Move on to something else."); 163:4-5 ("Mr. Kaltreider, don't testify."); 171:6-9 ("This is not proper cross-examination. He didn't testify about this at all on his direct examination. Cross-examination has to relate to what he was asked on direct."); 172:7-8 ("You've asked that question. Move on to something else."); 173:8-10 ("It doesn't matter what people in here have seen. He doesn't need to testify to that."); 174:23-25 ("This is not something he testified to on direct. So it's improper cross-examination."); 180:13-14 ("I've admitted it into evidence, so don't argue with me.").)

[14] After suggesting that she would introduce the verdict form to the jury, counsel for Simmons asked for the court's permission to show it, which the court denied.

In a cursory fashion, Simmons also objects that several specific evidentiary rulings prejudiced him and justify a new trial. Simmons cites several rulings, declares that they were erroneous without citation to any legal authority, and does not address why the rulings (even if clearly erroneous) constitute more than harmless error. On the merits, Kaltreider was entitled to testify about what he told Simmons in their 1994 meeting, it was relevant for Kaltreider to testify that Simmons had refused to give him access to the figures necessary to calculate his damages, and Simmons does not identify any actual instances in which the court permitted Kaltreider to lead Cindy Johnson or explain what harm it caused for the court to permit Kaltreider to lead her. Indeed, in his Rule 50(b) motion, Simmons contends that Johnson's testimony was not helpful to Kaltreider in the first place.

Simmons also contends that a mistrial is warranted because, in response to a request from the jury, the court sent a calculator to the jury without consulting the parties. Even if the court had consulted with the parties on this matter, the court is not aware of any rule precluding the jury from utilizing a calculator. The court cannot conceive of an argument that Simmons would have raised that would have convinced the court not to provide a calculator to the jury upon request. Even if it were somehow improper for the court to have provided the calculator, Simmons does not explain what practical difference providing the calculator had on the jury's deliberations. The jury awarded precisely the damages amount that Kaltreider requested at trial.

Finally, Simmons contends that he should be granted a mistrial because of two issues relating to the jury instructions. First, he contends that the court should have given an instruction on mitigation of damages, an issue that was "crucial" because Kaltreider "claimed that he could sell his formula for millions of dollars, yet never tried to do so." (Docket No. 201 at p. 10.) Simmons cites no legal authority for this position, nor is it clear to the court what point he

believes required a mitigation instruction. As the Magistrate Judge held, Kaltreider claimed only damages for non-payment, not damages for lost opportunity, thereby rendering mitigation irrelevant. Simmons has not convinced the court that this ruling was clear error. Moreover, Simmons is attempting to argue both sides of the same issue: at trial, he testified that the formulas were no longer helpful to him because the basis for them was "in the public domain," and anyone could create stock-picking formulas using that information. (*See* Tr. II at 43:21-44:25.) Second, Simmons argues that the court failed to instruct the jury about whether Kaltreider's travel costs were recoverable as contract damages. For the reasons explained in this opinion, the court agrees that it should have issued an instruction to that effect, that Kaltreider's litigation travel costs were not recoverable, and that the award must be reduced accordingly. This oversight requires a modest fixed adjustment to the damages award, not a new trial.

For all of these reasons, the court will deny the defendant's Rule 59 motion.

## CONCLUSION

For the reasons stated herein, subject to the reduction of the jury award by $2,235, the defendant's motions will be denied.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge